# United States Court of Appeals for the Federal Circuit

---

**SCHAEFFLER GROUP USA, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, INTERNATIONAL TRADE COMMISSION, THE TIMKEN COMPANY, MPB CORPORATION,**
*Defendants-Appellees*

---

2012-1269

---

Appeal from the United States Court of International Trade in Nos. 06-CV-0432, 07-CV-0064, 07-CV-0477, 08-CV-0387, 10-CV-0048, Judge Gregory W. Carman.

---

Decided: May 19, 2015

---

MAX FRED SCHUTZMAN, Grunfeld Desiderio Lebowitz Silverman & Klestadt LLP, New York, NY, argued for plaintiff-appellant. Also represented by ANDREW THOMAS SCHUTZ, KAVITA MOHAN, Washington, DC.

MARTIN M. TOMLINSON, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendants-appellees United States, United States Customs and Border Protec-

tion. Also represented by JOYCE R. BRANDA, JEANNE E. DAVIDSON, FRANKLIN E. WHITE, JR.; JESSICA MILLER, SUZANNA HARTZELL-BALLARD, Office of Assistant Chief Counsel, United States Customs and Border Protection, Indianapolis, IN.

PATRICK VINCENT GALLAGHER, JR., Office of the General Counsel, International Trade Commission, Washington, DC, argued for defendant-appellee International Trade Commission. Also represented by DOMINIC L. BIANCHI, ROBIN LYNN TURNER, JAMES M. LYONS, NEAL J. REYNOLDS.

TERENCE PATRICK STEWART, Stewart & Stewart, Washington, DC, argued for defendants-appellees The Timken Company, MPB Corporation. Also represented by GEERT M. DE PREST, PATRICK JOHN MCDONOUGH.

_____

Before NEWMAN, O'MALLEY, and WALLACH, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* O'MALLEY.

Concurring opinion filed by *Circuit Judge* WALLACH.

O'MALLEY, *Circuit Judge.*

The Continued Dumping and Subsidy Offset Act of 2000 ("CDSOA") provided for the distribution of antidumping duties collected by the United States to "affected domestic producers" ("ADPs") of the dumped goods. *See* Pub. L. No. 106–387, §§ 1001–03, 114 Stat. 1549, 1549A–72 to −75 (codified at 19 U.S.C. § 1675c (2000)), *repealed by* Deficit Reduction Act of 2005, Pub. L. No. 109–171, § 7601, 120 Stat. 4, 154 (Feb. 8, 2006). Schaeffler Group USA, Inc. ("Schaeffler") appeals from the decision of the Court of International Trade ("CIT") dismissing Schaeffler's challenge to the constitutionality of the

CDSOA under the Due Process Clause of the Fifth Amendment of the U.S. Constitution. *Schaeffler Grp. USA, Inc. v. United States*, 808 F. Supp. 2d 1358 (Ct. Int'l Trade 2012). Because we find that Congress had a rational basis justifying the retroactive application of the petition support requirement of the CDSOA, we affirm.

BACKGROUND

I

Much of the background regarding how the CDSOA applies to producers of dumped goods has been explained in detail in *SKF USA, Inc. v. U.S. Customs & Border Protection*, 556 F.3d 1337 (Fed. Cir. 2009) ("*SKF*"). As in *SKF*, this appeal involves the petition support requirement of the now-repealed CDSOA. In an antidumping investigation, the International Trade Commission ("ITC") must determine if the dumping of certain imports has materially injured or threatened material injury to the domestic industry. 19 U.S.C. § 1673 (2012). To assess material injury, the ITC sends questionnaires to foreign producers and exporters, as well as members of the domestic industry, seeking production and financial data. *SKF*, 556 F.3d at 1341. These questionnaires include a specific question asking the respondent to indicate whether they support, oppose, or take no position on the petition. *Id.* Relying on the information provided in these questionnaires, the ITC and the Department of Commerce ("Commerce") make final determinations that potentially lead to the imposition of an antidumping order. *Id.* The antidumping order imposes a duty on imported merchandise "in an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise," and the United States Customs and Border Protection ("Customs") agency collects these duties. 19 U.S.C. § 1673.

Under the CDSOA, rather than keep the collected duties in the United States Treasury, Customs distribut-

ed the duties to eligible ADPs within the particular domestic industry at issue. 19 U.S.C. § 1675c(a),(e) (2000), *repealed by* Pub. L. No. 109–171, § 7601, 120 Stat. at 154. Only members of the domestic industry that qualified as ADPs were eligible to receive the CDSOA distributions. *Id.* § 1675c(b)(1). The CDSOA defined "affected domestic producer" as:

> [A]ny manufacturer, producer, farmer, rancher or worker representative (including associations of such persons) that—(A) was a petitioner or interested party *in support of the petition* with respect to which an antidumping duty order, a finding under the Antidumping Act of 1921, or a countervailing duty order has been entered, and (B) remains in operation.

*Id.* (emphasis added) ("petition support provision"). The CDSOA required the ITC to provide Customs with a list of all "petitioners and . . . persons" that indicated support for all antidumping orders in effect as of January 1, 1999. *Id.* § 1675c(d)(1). The CDSOA also required the ITC to provide Customs with the names of any petitioners that indicated support for antidumping orders issued after enactment of the CDSOA. *Id.* Customs then published annual lists of ADPs, including instructions for how eligible ADPs could make a claim for CDSOA distributions. *SKF*, 556 F.3d at 1345. Producers who were not on Customs' annual list of ADPs could still seek CDSOA distributions, and Customs retained discretion over approval of such requests. The CDSOA applied to all antidumping and countervailing duties assessed and collected on entries between October 1, 2000, and October 1, 2007, when Congress repealed the CDSOA. Deficit Reduction Act of 2005, Pub. L. No. 109–171, § 7601, 120 Stat. at 154. Importantly, the repeal of the CDSOA was not retroactive—Congress stated that "[a]ll duties on entries of goods made and filed before October 1, 2007 . . .

SCHAEFFLER GROUP USA, INC. v. US

shall be distributed as if [the CDSOA] had not been repealed." *Id.* § 7601(b).

## II

Commerce initiated an antidumping investigation on antifriction bearings and parts thereof from the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom on April 27, 1988. *Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof from France: Initiation of Antidumping Duty Investigation*, 53 Fed. Reg. 15,074 (Apr. 27, 1988). The ITC instituted a material injury investigation on April 11, 1988. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom*, 53 Fed. Reg. 11,917 (Apr. 11, 1988). Schaeffler's predecessor corporate entities INA USA Corp. ("INA") and FAG Bearings Corp. ("FAG") participated in the investigations, but did not support the petition for any countries involved. The ITC eventually found a material injury to domestic industry, Views of the Commission, *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof from the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom*, USITC Pub. 2185 (May 1989), and Commerce instituted antidumping orders against certain classes of the relevant merchandise, *Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings and Parts Thereof From the Federal Republic of Germany*, 54 Fed. Reg. 20,900–11 (May 15, 1989).

The initial ITC list of qualifying ADPs sent to Customs included the antifriction bearings antidumping order issued on May 15, 1989. Customs then published its first notice of intent to distribute CDSOA funds on August 3, 2001. *Distribution of Continued Dumping and Subsidy*

*Offset to Affected Domestic Producers*, 66 Fed. Reg. 40,782, 40,788, 40,796 (Aug. 3, 2001). Schaeffler, INA, and FAG were not identified as eligible ADPs on either the ITC list or Customs notice because INA and FAG failed to indicate their support for the petition in the questionnaires they submitted during the ITC's material injury investigation. Schaeffler also did not appear as an ADP on any of the later notices of intent issued by Customs.

Schaeffler filed a written request with the ITC on May 4, 2007, seeking to be included as an ADP. Before receiving a response from the ITC, Schaeffler also filed a certification request with Customs on July 30, 2007, this time seeking a CDSOA distribution for fiscal year 2007. The ITC denied Schaeffler's request on August 2, 2007, and Customs denied Schaeffler's request on September 28, 2007. Schaeffler again petitioned Customs for CDSOA distributions for fiscal years 2008 and 2009, and Customs denied both requests.

Schaeffler also filed a series of complaints in the CIT between 2006 and 2009 seeking review of the determinations of the ITC and Customs, as well as challenging the constitutionality of the CDSOA. *Schaeffler Grp.*, 808 F. Supp. 2d at 1359–60. The court stayed Schaeffler's complaints pending resolution of the constitutional issues raised in *Pat Huval Restaurant & Oyster Bar, Inc. v. United States. Schaeffler Grp.*, 808 F. Supp. 2d at 1359–60. After we issued our decisions in *SKF* and *P.S. Chez Sidney v. U.S. International Trade Commission*, 409 F. App'x 327 (Fed. Cir. 2010), upholding the constitutionality of the CDSOA against First Amendment and equal protection challenges, the CIT consolidated Schaeffler's complaints. The ITC and intervenors Timken Company and MPB Corporation ("Timken") then moved to dismiss the complaints and sought judgment on the pleadings. *Schaeffler Grp.*, 808 F. Supp. 2d at 1359–60.

Schaeffler challenged the petition support requirement of the CDSOA under three provisions of the Constitution: (1) the free speech clause of the First Amendment as applied against Schaeffler; (2) the equal protection guarantees of the Due Process Clause of the Fifth Amendment as applied against Schaeffler; and (3) the substantive guarantees of the Due Process Clause of the Fifth Amendment. *Id.* at 1361. The CIT first held that Schaeffler failed to plead facts sufficient to distinguish its First Amendment and equal protection claims from those alleged and rejected in *SKF*. *Id.* at 1362–63. The CIT also concluded that the Supreme Court's then-recent decisions in *Snyder v. Phelps*, 562 U.S. 443 (2011), and *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), did not undermine our analysis in *SKF*. *Schaeffler Grp.*, 808 F. Supp. 2d at 1362–63. Schaeffler has not appealed the CIT's First Amendment and equal protection determinations.

The CIT further concluded that the CDSOA petition support requirement is not impermissibly retroactive under the Due Process Clause. *Id.* at 1363. Relying on its recent decision in *New Hampshire Ball Bearing, Inc. v. United States*, 815 F. Supp. 2d 1301 (Ct. Int'l Trade 2012), the court found "that 'it would not be arbitrary or irrational for Congress to conclude that the legislative purpose of rewarding domestic producers who supported antidumping petitions . . . would be 'more fully effectuated' if the petition support requirement were applied both prospectively and retroactively.'" *Id.* (quoting *N.H. Ball Bearing*, 815 F. Supp. at 1309). Concluding that the retroactive reach of the petition support requirement in the CDSOA was "justified by a rational legislative purpose," the court dismissed Schaeffler's due process cause of action for failure to state a claim upon which relief can be granted. *Id.*

Schaeffler filed a timely notice of appeal on March 14, 2012, challenging only the CIT's Due Process Clause

ruling.[1] We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

DISCUSSION

I

We review issues of constitutional interpretation de novo. *Ashley Furniture Indus., Inc. v. United States*, 734 F.3d 1306, 1309 (Fed. Cir. 2013) (citations omitted). Economic legislation "come[s] to the Court with a presumption of constitutionality," *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 637 (1993), which is "extremely difficult to overcome," *Wheeler v. United States*, 768 F.2d 1333, 1337 (Fed. Cir. 1985); *see also Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1338 (Fed. Cir. 2001) (en banc).

This is not the first appeal where our court has considered the constitutionality of the petition support requirement of the CDSOA. In *SKF*, the petitioner argued that the CDSOA violated the First Amendment because it authorized impermissible viewpoint discrimination, and violated the equal protection guarantees of the Due Process Clause because there was "no rational basis for distributing antidumping duties only to domestic producers who supported an antidumping petition, and excluding similarly situated domestic producers who opposed or took no position on a petition." *SKF*, 556 F.3d at 1346. The *SKF* majority first concluded that the petition support provision was valid under the First Amendment. *Id.* at 1349–60. Applying the doctrine of constitutional

---

[1] We stayed Schaeffler's appeal pending the appeal in *Ashley Furniture Industries, Inc. v. United States*, 734 F.3d 1306 (Fed. Cir. 2013). Upon our resolution of *Ashley Furniture*, we lifted the stay of Schaeffler's appeal on February 20, 2014.

avoidance, the majority found that "the purpose of the [CDSOA's] limitation of eligible recipients was to reward injured parties who assisted government enforcement of the antidumping laws by initiating or supporting anti-dumping proceedings," and that "the reward construction of the [CDSOA] is reasonable." *Id.* at 1352–53. The majority determined that SKF's responses to the ITC questionnaires are protected speech, and analyzed the "reward rationale" for the CDSOA under the commercial speech test outlined in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 461 (1980). *SKF*, 556 F.3d at 1354–60. Under the intermediate scrutiny of the *Central Hudson* test, the majority held that "the government has a substantial interest in rewarding those who assist in the enforcement of government policy" and that domestic industry partici-pants that oppose petitions but still respond to the ques-tionnaire provide information to the ITC and Commerce, but it was "rational for Congress to conclude that those who did not support the petition should not be rewarded," in successful enforcement actions. *Id.* at 1357–59.

The *SKF* panel similarly analyzed the "reward ra-tionale" under SKF's equal protection challenge. *Id.* at 1360. Applying rational basis review, the panel found "that the [CDSOA] is rationally related to the govern-ment's legitimate purpose of rewarding parties who promote the government's policy against dumping." *Id.* Judge Linn wrote a lengthy dissent disagreeing with the majority's First Amendment analysis. *Id.* at 1361–78 (Linn, J., dissenting). Judge Linn, however, agreed with the majority that the CDSOA would survive rational basis review. *Id.* at 1378 n.8 ("I agree with the majority's conclusion that, if the [CDSOA] were subject to rational basis review under the Equal Protection Clause, it would survive—though I do so for different reasons. Though the petition support requirement is not a good proxy for the seriousness of a domestic producer's injury, I would not

conclude, as the Court of International Trade did, that it is an *irrational* proxy."). We affirmed in *PS Chez Sidney* that "*SKF* is controlling with regards to all constitutional issues presented." 409 F. App'x at 329; *see also Ashley Furniture*, 734 F.3d at 1310 ("*SKF* resolved the facial First Amendment challenge presented in these cases. We are bound to follow this precedent . . . .").

As mentioned, the CIT previously upheld the petition support requirement as constitutional in the face of a Due Process Clause challenge in *New Hampshire Ball Bearing*. 815 F. Supp. 2d at 1306–09. The CIT found that the petition support requirement had retroactive effect "in that it conditions the receipt of distributions on support decisions including support decisions that were made before the statute was passed." *Id.* at 1307. Applying Supreme Court precedent from *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976), and *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984), the CIT concluded that the petitioner could not "meet the burden of showing that Congress acted arbitrarily and without a rational legislative purpose in retroactively applying the petition support requirement in the CDSOA." *N.H. Ball Bearing*, 815 F. Supp. 2d at 1309. The CIT found that the "reward rationale" identified by the *SKF* panel justified the retroactive application of the CDSOA petition support requirement, even though the analysis in *SKF* did not separately address retroactivity. *Id.* The court determined that because "Congress provided a reward mechanism that was considerably more comprehensive than the one based only on a prospective scheme," the "retroactive reach of the petition support requirement . . . is justified by a rational legislative purpose . . . ." *Id.*; *see also id.* ("It was not arbitrary or irrational for Congress to conclude that the legislative purpose of rewarding domestic producers who supported antidumping petitions . . . would be more fully effectuated if the petition support requirement were applied both

prospectively and retrospectively." (internal citation omitted)).

## II

## A

As an initial matter, the ITC argues that the CDSOA was not retroactive legislation under the test set out in *Princess Cruises, Inc. v. United States*, 397 F.3d 1358 (Fed. Cir. 2005). The ITC states that, under the three-factor test described in *Princess Cruises*, the CDSOA did not impose any new duty or disability on Schaeffler's past actions, Schaeffler could not have had settled expectations that it would receive distributions prior to enactment of the CDSOA, and there was an insufficient degree of connection between the CDSOA and Schaeffler's past conduct. ITC Br. at 18–21. Schaeffler, Customs, and Timken, on the other hand, all agree that the CDSOA applied retroactively.

We agree with Schaeffler, Customs, and Timken that the CDSOA applied retroactively. *See Pat Huval Rest. & Oyster Bar, Inc. v. Int'l Trade Comm'n*, No. 2012-1250, 2015 WL 2108514, at *3–4 (Fed. Cir. May 7, 2015) (holding that the CDSOA is "retroactive in effect"). The court in *Princess Cruises* adopted the test for retroactivity from the Supreme Court's opinion in *Landgraf v. USI Film Products*, 511 U.S. 244 (1994). The *Landgraf* court made clear, however, that when Congress "expressly prescribed the statute's proper reach . . . . there is no need to resort to judicial default rules." *Id.* at 290; *see also id.* at 264 (In other words, "[w]here the congressional intent is clear, it governs."). When a statute, on its face, applies retroactively, it is unnecessary for us to rely on the factors identified by *Landgraf* and *Princess Cruises*.

Section 1675c(d)(1) states that the ITC must forward a list of ADPs to Customs "in the case of orders or findings in effect on January 1, 1999." *SKF*, 556 F.3d at 1341 n.3.

Commerce then used this list to determine the parties eligible for the initial CDSOA distributions based on their response to questionnaires predating the CDSOA. *Id.* Congress passed the CDSOA on October 28, 2000, thus it is clear on the face of the statute that the petition support requirement applied to conduct (i.e., responses to a questionnaire question) that occurred prior to enactment of the statute. The statute expressly has retroactive effect, so we need not rely on the *Princess Cruises* analysis to conclude that the CDSOA petition support requirement applies retroactively. Because this provision has retroactive effect, we must continue our analysis to determine if that retroactive effect violates the Due Process Clause of the Fifth Amendment.

B

Schaeffler argues that the petition support requirement of the CDSOA violated the Due Process Clause by being impermissibly retroactive. In response, Customs and Timken first question whether Schaeffler established that it had any property interest protected by the Due Process Clause. Customs Br. at 19–23. Customs and Timken contend that, to succeed on a Due Process Clause challenge, the petitioner must first demonstrate that it has a protected property interest. Customs and Timken claim that Schaeffler has only shown that it had a reliance interest in the pre-CDSOA antidumping laws remaining unchanged, or that it had a protected interest in the government not providing substantial economic assistance to its competitors—neither of which, according to Customs and Timken, is a sufficient property interest protected by the Due Process Clause. Schaeffler responds that it has a protected property interest because, when it checked the box to oppose a petition, it believed that it would not be subjecting itself to competitive harm through the aggrandizement of its competitors. Reply Br. at 2–6.

We recently addressed a similar dispute involving a Due Process Clause challenge to the retroactive effect of an amendment to the Tariff Act of 1930 regarding non-market economies. *GPX Int'l Tire Corp. v. United States*, 780 F.3d 1136 (Fed. Cir. 2015). In *GPX*, the government similarly alleged that the petitioner lacked a vested right protected by the Due Process Clause, which, it argued, precluded us from having to perform a rational basis analysis. We recognized that "the outcome of the due process analysis [does not] depend[] upon a determination that a vested right exists," and that, although the "vested right analysis . . . may be relevant to the due process analysis, it is not a threshold test." *Id.* at 1141 (citing *Weaver v. Graham*, 450 U.S. 24, 29–30 (1981) ("Evaluating whether a right has vested is important for claims under the Contracts or Due Process Clauses, which solely protect pre-existing entitlements.")). Similarly, here, although the vested rights analysis requested by the government may be "relevant to the due process analysis," we choose not to reach that question because we find that Congress had a rational basis for the retroactive effect of the petition support requirement. *See Pat Huval*, 2015 WL 2108514, at *4 n.2 (declining to address "whether the competitive injury [under the CDSOA] claimed by the appellants constitutes a deprivation of a cognizable property interest of the sort sufficient to trigger procedural due process rights"). We, thus, assume without deciding, for purposes of our analysis, that Schaeffler had a protected property interest implicating the Due Process Clause. *See, e.g.*, *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52, 67 (2009) (assuming without deciding that the respondent "invoked the proper federal statute in bringing his claim," because the Court's "resolution of [respondent's] claim does not require us to resolve this difficult issue").

C

Schaeffler challenges the retroactive application of the petition support requirement of the CDSOA as a violation of the Due Process Clause. "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery*, 428 U.S. at 15. Specifically, retroactive legislation is "not unlawful solely because it upsets otherwise settled expectations . . . even though the effect of the legislation is to impose a new duty or liability based on past acts." *Id.* at 16.

The retrospective aspects of an Act of Congress must, however, meet the requirements of due process—the justification for the Act "must take into account the possibility that the [plaintiffs] may not have known of the danger . . . and that even if they did know of the danger their conduct may have been taken in reliance upon the current state of the law." *Id.* at 17. Based on these considerations, the Supreme Court has established a test for analyzing retroactive economic legislation under the Due Process Clause—"the retroactive application of a statute" must be "supported by a legitimate legislative purpose furthered by rational means." *Gray*, 467 U.S. at 729; *see also General Motors v. Romein*, 503 U.S. 181, 191 (1992). The burden placed on retroactive legislation "is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." *Id.* at 730.

Under this analysis, the Supreme Court has, for example, upheld a retroactive requirement that mine owners provide compensation to former employees disabled due to black lung disease "bred during employment" as a "rational measure to spread the costs of the employees'

disabilities," *Usery*, 428 U.S. at 15–18; upheld retroactive amendments to ERISA enacted to prevent employers from withdrawing early from multiparty pension plans due to pending changes in the law that would impose larger contributions from the employer as a rational means of preventing employers from "taking advantage of the lengthy legislating process," *Gray*, 467 U.S. at 729–32; upheld a retroactive statute passed by the Michigan legislature to "correct[] the unexpected results of the Michigan Supreme Court's . . . opinion" involving payment of workers' compensation benefits, *Romein*, 503 U.S. at 191; and upheld a retroactive change to an estate tax deduction as a rational approach taken to "correct what [Congress] reasonably viewed as a mistake" in the original provision of the Tax Code granting the deduction, *United States v. Carlton*, 512 U.S. 26, 31–34 (1994). *See also Commonwealth Edison*, 271 F.3d at 1344–45 (listing examples where the Supreme Court upheld retroactive legislation against a Due Process Clause challenge). And, as mentioned, we recently upheld a retroactive change to how antidumping and countervailing duties are applied to non-market economies under the Tariff Act of 1930 against a Due Process Clause challenge. *GPX Int'l*, 780 F.3d at 1142–44 (noting five "considerations" relevant to the rational basis analysis under the Due Process Clause).

Schaeffler thus has the burden to establish that Congress "acted in an arbitrary and irrational way" when it applied the petition support requirement of the CDSOA to conduct pre-dating the Act. *Usery*, 428 U.S. at 15. Schaeffler argues that the retroactive application of the CDSOA could not support a "legitimate legislative purpose," *Gray*, 467 U.S. at 729, because rewarding speech that predated the Act would not assist the government in preventing dumping at the time of the CDSOA—the "reward rationale" would only support prospective application of the petition support requirement because a reward can only affect conduct once the industry had

notice of the effect of choosing to support or not support a petition. Appellant Br. at 24–25. Schaeffler further argues that, in *SKF*, the panel explained that the petition support requirement incentivized, rather than rewarded, domestic producers to support petitions. Reply Br. at 7–12. And, because an incentive can only affect parties with notice of the incentive, the retroactive effect of the CDSOA's petition support requirement would not be justified by a rational basis. *Id.* In response, Customs, the ITC, and Timken all argue that the rational basis identified in *SKF* is sufficient to justify retroactive application of the petition support requirement, and that the *SKF* majority clearly explained that the purpose of the petition support requirement was to reward support of petitions, not merely to incentivize future conduct.

Rational basis review of economic legislation under the Due Process Clause is highly deferential to Congress, and we hold that Schaeffler has failed to demonstrate that the retroactive application of the petition support requirement was not "supported by a legitimate legislative purpose furthered by rational means." *Gray*, 467 U.S. at 729; *see also Pat Huval*, 2015 WL 2108514, at *4–6 (determining that "[t]he *SKF* court's conclusion that the statute promoted a substantial governmental interest in a rational manner . . . is nonetheless squarely applicable here"). It is true that *SKF* involved a prospective equal protection challenge, and the scope of the rational basis analysis under the Equal Protection Clause may not always be coextensive with the rational basis analysis under the substantive component of the Due Process Clause, especially "[w]hen a law exhibits . . . a desire to harm a politically unpopular group." *See Lawrence v. Texas*, 539 U.S. 558, 580–82 (2003) (O'Connor, J., concurring in the judgment) (noting that the government's interest in promoting morality was considered a sufficient justification to uphold a state law criminalizing sodomy under a due process challenge in *Bowers v. Hardwick*, 478

U.S. 186 (1986), but not for rational basis review under the Equal Protection Clause). For review of the petition support requirement, however, we find that the rational basis justification identified by the *SKF* panel in its equal protection analysis also provides a sufficient rational basis under a due process challenge. *See, e.g.*, *Armour v. City of Indianapolis*, 132 S. Ct. 2073, 2080 (2012) (citing to both due process and equal protection challenges in explaining the thrust of rational basis review); *Zablocki v. Redhail*, 434 U.S. 374, 407 (1978) (Rehnquist, J., dissenting) (same). And Schaeffler has failed to demonstrate that a prospective analysis of the petition support requirement under rational basis review pursuant to equal protection grounds would differ from rational basis review under the substantive aspects of the Due Process Clause *in this case*. The only question remaining is if the rational basis identified by the *SKF* panel justifies retroactive application of the petition support requirement under the Due Process Clause.

Schaeffler claims that the *SKF* panel found the petition support requirement justified because it acted as an incentive for domestic parties to support an antidumping petition. But nowhere in the *SKF* opinion did the court state that the petition support requirement acted as an incentive—the panel bluntly stated that "the purpose of the Byrd Amendment's limitation of eligible recipients was to reward injured parties who assisted government enforcement of the antidumping laws . . . ." *SKF*, 556 F.3d at 1352; *see also id.* at 1353 (referring to its approach as the "reward justification," and stating that "the language of the [CDSOA] is easily susceptible to a construction that rewards action . . . ."). The panel later reiterated that the "government has a substantial interest in rewarding those who assist in the enforcement of government policy." *Id.* at 1355. Although Schaeffler is correct that the panel's comparisons to qui tam and whistleblower actions may also potentially support an incentive

justification for the CDSOA, these references, alone, do not abrogate the clear language of *SKF*, concluding that a "reward justification" provides the necessary rational basis to justify the petition support requirement under an equal protection challenge to the CDSOA. *See Pat Huval*, 2015 WL 2108514, at *6–7 (holding the reward justification to be a valid legislative purpose). We are bound by that unequivocal holding. *Deckers Corp. v. United States*, 752 F.3d 949, 959 (Fed. Cir. 2014) ("In this Circuit, a later panel is bound by the determinations of a prior panel, unless relieved of that obligation by an en banc order of the court or a decision of the Supreme Court.").

Under the "reward justification" developed in *SKF*, we find that the retroactive application of the petition support requirement of the CDSOA is "supported by a legitimate legislative purpose furthered by rational means." *Gray*, 467 U.S. at 729. Congress could have rationally decided to reward those parties that supported antidumping orders entered both before and after Congress enacted the CDSOA. *See N.H. Ball Bearing*, 815 F. Supp. 2d at 1309 ("It was not arbitrary or irrational for Congress to conclude that the legislative purpose of rewarding domestic producers who supported antidumping petitions . . . would be more fully effectuated if the petition support requirement were applied both prospectively and retrospectively." (internal citation omitted)). Producers that supported antidumping petitions before and after the CDSOA contributed equally to eventual antidumping orders, making it rational for Congress to have treated these two groups similarly when providing *rewards*. Congress could have rationally envisioned the petition support requirement as a means of granting a reward to those parties that supported antidumping petitions even before Congress enacted the CDSOA. We conclude that the retroactive application of the petition support requirement of the CDSOA is justified by a rational basis

sufficient to meet the requirements of the Due Process Clause of the Fifth Amendment.

CONCLUSION

Because we conclude that the retroactive application of the petition support requirement of the CDSOA rationally relates to the government's interest in rewarding members of the domestic industry that supported anti-dumping petitions, we affirm the CIT's determination that the petition support requirement does not violate the Due Process Clause of the Fifth Amendment.

**AFFIRMED**

# United States Court of Appeals for the Federal Circuit

---

**SCHAEFFLER GROUP USA, INC.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES, UNITED STATES CUSTOMS AND BORDER PROTECTION, INTERNATIONAL TRADE COMMISSION, THE TIMKEN COMPANY, MPB CORPORATION,**
*Defendants-Appellees*

---

2012-1269

---

Appeal from the United States Court of International Trade in Nos. 06-CV-0432, 07-CV-0064, 07-CV-0477, 08-CV-0387, 10-CV-0048, Judge Gregory W. Carman.

---

WALLACH, *Circuit Judge*, concurring.

I agree the district court correctly dismissed the challenge of Schaeffler Group USA, Inc. ("Schaeffler"), under the Fifth Amendment's Due Process Clause, to the Continued Dumping and Subsidy Offset Act of 2000 ("CDSOA"), Pub. L. No. 106-387, §§ 1001–03, 114 Stat. 1549, *repealed by* Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 7601(a), 120 Stat. 4, 154 (2006). This court's precedent requires that outcome. *See SKF USA, Inc. v. U.S. Customs & Border Prot.*, 556 F.3d 1337, 1360 (Fed. Cir. 2009) (holding the petition support requirement of the CDSOA was constitutional under both the First

Amendment and Equal Protection Clause because it "furthers the government's substantial interest in enforcing the trade laws"). I write separately because, in my view, *SKF* incorrectly concluded the retroactive application of the CDSOA rationally furthers a legitimate government interest, and *SKF* should therefore be overruled by this court sitting en banc. *See* Fed. Cir. R. 35(a)(1) ("[O]nly the court en banc may overrule a binding precedent.").

I.   UNDER THE DUE PROCESS CLAUSE, THE RETROACTIVE
APPLICATION OF A STATUTE MUST BE SUPPORTED BY A
LEGITIMATE PURPOSE FURTHERED BY RATIONAL MEANS

The Constitution's Due Process Clause provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Due Process Clause guarantees both "substantive due process" and "procedural due process." *United States v. Salerno*, 481 U.S. 739, 746 (1987). Only substantive due process is at issue in this appeal.

The Supreme Court has explained that the guarantee of substantive due process prevents the government from engaging in conduct, such as the enactment of legislation, "that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.'" *Id.* (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952); *Palko v. Connecticut*, 302 U.S. 319, 325–26 (1937)). Where no fundamental right is at issue, legitimate government action will normally be upheld so long as there is a rational basis for it. *See Lawrence v. Texas*, 539 U.S. 558, 588 (2003) (Scalia, J., dissenting) ("*[O]nly* fundamental rights which are deeply rooted in this Nation's history and tradition qualify for anything other than rational-basis scrutiny under the doctrine of substantive due process.") (internal quotation marks omitted). Specifically, "in the field of national economic policy," the Court has held the Due Process Clause will not serve to invalidate a retroac-

tive statute so long as "the retroactive application of [the] statute is supported by a *legitimate* legislative purpose furthered by *rational* means." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984) (emphases added).

## II. THE CDSOA'S RETROACTIVE APPLICATION IS NOT SUPPORTED BY A LEGITIMATE LEGISLATIVE PURPOSE FURTHERED BY RATIONAL MEANS

### A. Stated Legislative Purpose

When Congress enacted the CDSOA in 2000, it explained the purpose of the legislation in a section titled "Findings of Congress":

Congress makes the following findings:

(1) Consistent with the rights of the United States under the World Trade Organization, injurious dumping is to be condemned and *actionable subsidies which cause injury to domestic industries must be effectively neutralized.*

(2) United States unfair trade laws *have as their purpose the restoration of conditions of fair trade* so that jobs and investment that should be in the United States are not lost through the false market signals.

(3) The continued dumping or subsidization of imported products after the issuance of antidumping orders or findings or countervailing duty orders can frustrate the *remedial purpose* of the laws by preventing market prices from returning to fair levels.

(4) Where dumping or subsidization continues, domestic producers will be reluctant to reinvest or rehire and may be unable to maintain pension and health care benefits that conditions of fair trade would permit. Similarly, small businesses

and American farmers and ranchers may be unable to pay down accumulated debt, to obtain working capital, or to otherwise remain viable.

(5) United States *trade laws should be strengthened to see that the remedial purpose of those laws is achieved.*

Pub. L. No. 106–387, § 1002, 114 Stat. 1549 (2000) (codified at 19 U.S.C. § 1675c (2000)) (emphases added) ("CDSOA Findings"). These findings indicate the stated purpose of the CDSOA is to "strengthen[]" the trade laws so they may achieve their "remedial purpose," CDSOA Findings ¶ 5, and that the purpose of United States unfair trade laws generally is "the restoration of conditions of fair trade," *id.* ¶ 2; *see also* Gov't Accountability Office, GAO-05-979, *Issues and Effects of Implementing the Continued Dumping and Subsidy Offset Act* 3 (2005), *available at* http://www.gao.gov/new.items/d05979.pdf (explaining that "in passing CDSOA, Congress aimed to strengthen the remedial nature of U.S. trade laws").

To the extent CDSOA distributions "restor[e] . . . conditions of fair trade," CDSOA Findings ¶ 2, they do so differently than the antidumping and countervailing duties from which they are drawn. Antidumping duties by statute must be imposed "in an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673; *see also* 19 U.S.C. § 1671(a) (Countervailing duties are to be imposed in an amount "equal to the amount of the net countervailable subsidy."). By imposing a duty in an amount that offsets unlawfully low prices, these orders serve to "neutralize[]" the effects of dumping or actionable subsidies. *See* CDSOA Findings ¶ 1. Because they apply generally to imported goods that compete with domestically produced goods, the duties serve to remedy harm to the domestic industry as a whole.

By contrast, CDSOA subsidies are drawn from the antidumping duties collected by United States Customs and Border Protection and redistributed to only those members of industry who supported the antidumping petition. *See SKF*, 556 F.3d at 1341–42; *id.* at 1351 (The CDSOA "did not compensate all injured domestic producers."). Because antidumping and countervailing duties already help to restore conditions of fair trade by raising the price of imported goods to their fair value, an argument could be made that CDSOA distributions do not promote the restoration of fair trade but instead constitute a double remedy, an issue not addressed by the *SKF* court.[1]

---

[1]    The extent to which the CDSOA promotes fair trade was called into question by the report of the World Trade Organization's Appellate Body, which found the CDSOA "inconsistent with certain [United States treaty obligations under] the *Anti-Dumping Agreement* and the [*Agreement on Subsidies and Countervailing Measures*]." World Trade Organization, Report of the Appellate Body, *United States—Continued Dumping and Subsidy Offset Act of 2000*, WT/DS234/AB/R ¶ 318(b) (Jan. 16, 2003) ("Appellate Body Report"); *see also Giorgio Foods, Inc. v. United States*, No. 2013-1304, 2015 WL 1865702, at *14 (Fed. Cir. Apr. 24, 2015) (Reyna, J., dissenting) ("[P]etition support expressions, in [U.S. International Trade Commission] questionnaire responses, do not further the enforcement of antidumping laws."). The Appellate Body stated that "[o]ffset payments to 'affected domestic producers' when combined with anti-dumping duties operate to impose a double remedy in respect of dumped goods." Appellate Body Report ¶ 43. The CDSOA was repealed after the Appellate Body's ruling. Deficit Reduction Act of 2005, Pub. L. No. 109-171,

There is little doubt that restoring conditions of fair trade is a legitimate government interest. However, even assuming the CDSOA as a whole promotes this interest, to survive substantive due process scrutiny the legitimate interest must be rationally furthered not only by the legislation as a whole, but also by the retroactive portion of the legislation. *Gray*, 467 U.S. at 730 ("'The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former.'" (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 17 (1976)); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994) ("[A] justification sufficient to validate a statute's prospective application under the [Due Process] Clause may not suffice to warrant its retroactive application.") (internal quotation marks and citation omitted).

The problem with the CDSOA is that the asserted explanation of how the retroactive portion of the legislation rationally furthers the government's legitimate interest in restoring conditions of fair trade borders on the frivolous. In *SKF*, the government asserted the retroactive aspect of the CDSOA promotes the restoration of fair trade by compensating those who were injured by dumping, and petition support is merely a surrogate for injury. *See SKF*, 556 F.3d at 1351. In the government's view, those members of the domestic industry that supported the petition are assumed to have suffered the greatest injury. *Id.* Although the *SKF* court upheld the law and agreed the CDSOA as a whole "was designed to compensate domestic producers injured by dumping," the court rejected the government's argument that the petition support requirement served only to identify those suffering the

_____

§ 7601(a), 120 Stat. 4, 154 (Feb. 8, 2006; effective Oct. 1, 2007).

greatest injury, finding this rationale "simply implausible in light of . . . the absence of any evidence in the legislative history that the support requirement was designed as a proxy for injury, and the availability of far more direct and accurate methods of measuring injury." *Id.* at 1350, 1351.

The restoration of conditions of fair trade might have been rationally furthered by the retroactive portion of the CDSOA had Congress chosen to either compensate all injured industry members or allocate funds in some colorable relation to injury. However, petition support as a proxy for injury is far too inaccurate a measure if indeed it relates to injury at all. As explained by the dissent in *SKF*, "[A] domestic producer might oppose a petition to protect business relationships in foreign countries having nothing to do with the domestic market, or it might decline to support a petition for fear of retaliation in export markets." *SKF*, 556 F.3d at 1374 (Linn, J., dissenting). Indeed, although not controlling on the issue of congressional intent, *id.* at 1352, the United States took the position before the World Trade Organization that "[t]he amount of the [CDSOA] distributions *have [sic] nothing to do with the injury* to the domestic producer or the recovery of 'damages' by the domestic producer." World Trade Organization, Report of the Panel, *United States—Continued Dumping and Subsidy Offset Act of 2000*, WT/DS217/R, WT/DS234/R ¶ 4.502 (Sept. 16, 2002), *aff'd*, Appellate Body Report (emphasis added).

While "under the deferential standard of review applied in substantive due process challenges to economic legislation there is no need for mathematical precision in the fit between justification and means," *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 639 (1993), an inappropriate means must, at some point, become unconstitutionally arbitrary, *Washington v. Glucksberg*, 521 U.S. 702, 735 (1997) (finding the means employed by the government to be "at

least reasonably related" to "unquestionably important and legitimate" interests); *see also Reno v. Flores*, 507 U.S. 292, 305 (1993) (The Due Process Clause "demands no more than a *reasonable fit* between government purpose . . . and the means chosen to advance that purpose.") (internal quotation marks omitted) (emphasis added); *cf. FCC v. Beach Comm'cns, Inc.*, 508 U.S. 307, 313–14 (1993) (stating that a statutory classification will be upheld "if there is any *reasonably* conceivable state of facts that could provide a rational basis for [it]") (emphasis added); *Nordlingher v. Hahn*, 505 U.S. 1, 11 (1992) ("[T]he relationship of the classification to its goal" must not be "so attenuated as to render the distinction arbitrary or irrational."). The due process right may not require that Congress's actions reflect "mathematical exactitude" in fitting means to ends, *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976), but the connection between means and ends must be grounded on something more than an unreasonable, hypothetical connection that the United States has expressly disclaimed in related proceedings.

Moreover, the problem the government was facing was not one that "may justify, if . . . not require, rough accommodations." *Heller v. Doe*, 509 U.S. 312, 321 (1993) (quoting *Metropolis Theatre Co. v. Chicago*, 228 U.S. 61, 69–70 (1913)). To the extent Congress's purpose was to restore conditions of fair trade by neutralizing the effects of injurious dumping and actionable subsidies, "far more direct and accurate methods of measuring injury" were readily available to it. *SKF*, 556 F.3d at 1351. The present case is nothing like cases upholding acts of Congress as rationally related to a legitimate government interest despite the fact that the law was "not made with mathematical nicety." *City of Dallas v. Stanglin*, 490 U.S. 19, 21, 26 (1989) (internal quotation marks and citation omitted) (upholding a law restricting admission to certain dance halls to persons between the ages of fourteen and

eighteen to protect them from "detrimental influences of older teenagers and young adults"); *Vance v. Bradley*, 440 U.S. 93 (1979) (upholding a law imposing mandatory retirement at age sixty for certain employees but not others); *Dandridge v. Williams*, 397 U.S. 471 (1970) (upholding a law limiting welfare benefits to $250 per month regardless of family size).

Instead, it bears a closer resemblance to cases such as *Plyler v. Doe*, in which the Supreme Court found irrational a law that purportedly furthered a state's interest in protecting itself from an influx of illegal immigrants by denying a free education to undocumented children. 457 U.S. 202 (1982). The Court explained that because "[t]he dominant incentive for illegal entry into the State of Texas is the availability of employment," charging tuition to undocumented children "constitutes a ludicrously ineffectual attempt to stem the tide of illegal immigration, at least when compared with the alternative of prohibiting the employment of illegal aliens." *Id.* at 228–29 (internal quotation marks and citation omitted).

## B. Other Conceivable Purposes

Considering the equal protection guarantees of the Fifth Amendment's Due Process Clause, the Supreme Court has explained "it is entirely irrelevant for constitutional purposes whether the legislature was actually motivated by the conceived reason for the challenged distinction." *Beach Comm'cns*, 508 U.S. at 315; *see also id.* at 313 (Legislation will be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis" for it.). To the extent this principle applies to the substantive due process context, other conceivable

government interests must be considered.[2]  *See, e.g., Crider v. Bd. of Cnty. Comm'rs*, 246 F.3d 1285, 1290 (10th Cir. 2001) (stating, in the context of a substantive due process challenge, that "under rational basis analysis, we look only to whether a reasonably conceivable rational basis exists") (internal quotation marks and citation omitted); *37712, Inc. v. Ohio Dep't of Liquor Control*, 113 F.3d 614, 620 (6th Cir. 1997) ("[I]f any conceivable legitimate governmental interest supports the contested ordinance, that measure is not 'arbitrary and capricious' and hence cannot offend substantive due process norms."); *California v. FCC*, 905 F.2d 1217, 1238 (9th Cir. 1990) ("[U]nder the due process and equal protection clauses," agency action will be upheld "if it has any conceivable rational basis.").

Although the "restoration of conditions of fair trade" by remedying unfair trade practices and neutralizing illegal dumping or subsidies may have been the stated purpose of Congress in enacting the CDSOA, it is not the only conceivable legitimate government interest that may be served by the CDSOA.  The *SKF* court, for example, framed the legitimate interest somewhat differently, stating "the purpose of the [CDSOA's] limitation of eligi-

---

[2]  It is not clear other conceivable purposes must be considered where, as here, the legislature has expressly stated the purposes of the law.  *See Zobel v. Williams*, 457 U.S. 55, 61 n.7 (1982) (The law's "purposes were enumerated in the first section of the Act creating the dividend distribution plan . . . .  Thus we need not speculate as to the objectives of the legislature.").  However, even if other conceivable reasons are considered, as they have been by the *SKF* court and the majority today, the retroactive portion of the CDSOA does not rationally further a legitimate government interest.

ble recipients was to *reward injured parties* who *assisted* government enforcement of the antidumping laws by initiating or supporting antidumping proceedings." *SKF*, 556 F.3d at 1352 (emphases added). The court explained that "by rewarding injured parties who *assist* in this enforcement," the CDSOA "directly advances the government's substantial interest in trade law enforcement." *Id.* at 1355 (emphasis added).

This analysis conflates rewarding past action with incentivizing present or future action, as reflected in the inconsistent tenses used by the *SKF* court in its reasoning. Although the creation of a prospective incentive that rewards those who *assist* by providing petition support might be rationally expected to further the goal of enforcing trade policy, rewarding the pre-enactment choice of those who *assisted* by supporting a petition is gratuitous and unrelated to this goal, and thus arbitrary within the meaning of the Due Process Clause.

The error in the *SKF* court's reasoning is reflected in its comparison of CDSOA distributions to payments in qui tam or whistleblower actions and to the awarding of attorney fees to successful plaintiffs "who vindicate government policy" such as "in actions under Title VII." *Id.* at 1356. Payments in these actions are provided to relators, whistleblowers, or litigants who know of the reward in advance. They are therefore analogous to the prospective payments available under the CDSOA. However, the payments in these comparison actions are unlike the retroactive CDSOA distributions because the former operate as incentives to induce future activity that furthers the government's legitimate interest. By contrast, the ex post provision of a reward for activity already undertaken cannot in any meaningful way further the government's interest in enforcement of the trade laws.

To the extent *SKF* held the reward itself (as distinct from any object sought to be achieved via the provision of

the reward) is a legitimate purpose, *see SKF*, 556 F.3d. at 1352 ("[T]he purpose . . . was to reward."), the Supreme Court has foreclosed this theory, *see Zobel v. Williams*, 457 U.S. 55 (1982) (rejecting the argument that a bare reward that operates retrospectively and is unrelated to any present or future incentive effect rationally furthers a legitimate state interest). In *Zobel*, the Court considered a 1980 Alaska law that distributed state oil revenues to residents in proportion to "each year of residency [in Alaska] subsequent to 1959." *Id.* at 57. Among the stated purposes of the legislation was "to encourage persons to maintain their residence in Alaska and to reduce population turnover in the state." *Id.* at 61 n.7. In distinguishing the possible prospective incentive (based on the duration of residency following enactment) from the retroactive reward (based on the duration of residency prior to enactment), the Court first held there was no rational connection between the retroactive reward and the asserted interest:

> Assuming, *arguendo*, that granting increased dividend benefits for each year of continued Alaska residence might give some residents an incentive to stay in the State in order to reap increased dividend benefits in the future, *the State's interest is not in any way served by granting greater dividends to persons for their residency during the 21 years prior to the enactment.*

*Id.* at 62 (emphasis added).

The Court then considered whether the reward itself, irrespective of any relationship to a present or future incentive, could constitute a legitimate interest. Citing precedent, the Court concluded that "[t]he last of the State's objectives—to reward citizens for past contributions" "is not a legitimate state purpose." *Id.* at 63. In a concurring opinion, Justice O'Connor explained that "[t]he Court's opinion . . . insures that any governmental pro-

gram depending upon a 'past contributions' rationale will violate the Equal Protection Clause [because it does not further a legitimate purpose]."[3] *Id.* at 73.

---

[3]     In a related appeal, this court states "a legislative purpose to reward particular conduct is valid for its own sake, not just because it may have the effect of incentivizing particular conduct." *Pat Huval Rest. & Oyster Bar, Inc. v. Int'l Trade Comm'n*, No. 2012-1250, 2015 WL 2108514, at *6 (Fed. Cir. May 7, 2015). By way of example, it explains that "a legislative program retroactively providing benefits to veterans is justified as a reward to the veterans for their service; its rationality does not depend on whether the program induces others to join the military." *Id.* The analogy fails. The veteran has a reasonable expectation that his services will be rewarded, as do employees generally. Until the CDSOA, there was no similar expectation that petition support would be rewarded, making the retroactive change capricious. This distinction is consonant with *Zobel*, in which the residents of Alaska could not have known, years before the enactment of the retroactive legislation, that a benefit would be forthcoming. Moreover, concerns of legislative favoritism are significantly diminished where benefits are dispersed evenly and widely across large numbers of individuals, rather than concentrated in a small number of large corporations. *See infra* note 4 and accompanying text.

The attempt in *Pat Huval* to distinguish *Zobel* collides with the latter's express language. *Compare Pat Huval*, 2015 WL 2108514, at *5 ("Nothing in *Zobel* suggests that its analysis is so broad as to render *illegitimate* any legislative action designed to *reward conduct that preceded* the enactment of the legislation.") (emphases added), *with Zobel*, 457 U.S. at 63 ("The last of the State's objectives—to *reward citizens for past contributions*" "is *not a*

Cases cited by the majority where courts have upheld retroactive rewards (or the imposition of retroactive liability) as rationally related to a legitimate government interest are distinguishable. In *Commonwealth Edison Co. v. United States*, this court upheld as constitutionally permissible a portion of the Energy Policy Act of 1992 that retroactively imposed "special monetary assessments on domestic utilities for the remediation of environmentally contaminated uranium processing facilities owned by the United States." 271 F.3d 1327, 1329 (Fed. Cir. 2001). The monetary assessments rationally furthered the legitimate interest of environmental cleanup. In addition, "Congress reasonably concluded that the utilities . . . contributed to the contamination" and the "utilities could have reasonably expected to be liable for a share of the remediation costs." *Id.* at 1330; *see also id.* at 1332 ("[T]here is no question that the processing of the utilities' uranium caused . . . contamination . . . ."). In contrast to the undoubted environmental harm caused by the past actions of the utilities in *Commonwealth Edison*, no harm to trade law enforcement resulted from the past nonsupport of Schaeffler in any case where CDSOA distributions are at issue, since those distributions will be made only where an antidumping petition was successful notwithstanding Schaeffler's failure to support it.

In *Turner Elkhorn*, coal mine operators challenged the constitutionality of the Federal Coal Mine Health and Safety Act of 1969, which imposed potential liability on

---

*legitimate* state purpose.") (emphases added), *and id.* at 73 (O'Connor, J., concurring) ("The Court's opinion . . . insures that *any governmental program* depending upon a '*past contributions*' rationale will violate the Equal Protection Clause" because, according to the Court, it lacks "*any legitimacy.*") (emphases added).

the operators for black lung disease "caused by long-term inhalation of coal dust." 428 U.S. at 6. The operators argued the law "spread[] costs in an arbitrary and irrational manner" that "[gave] an unfair competitive advantage to new entrants into the industry." *Id.* at 18. The Court held it was "for Congress to choose" how to allocate the financial burden and that it was sufficient that the law "approache[d] the problem of cost spreading rationally." *Id.* at 18–19. Unlike the law at issue in *Turner Elkhorn*, the purported rationality of the CDSOA is not based on Congress's decision to impose liability on "those who have profited from the fruits of" activities that contributed to a societal problem. *Id.* at 18. There is nothing in the record demonstrating harm, caused by Schaeffler's nonsupport, that the retroactive aspect of the CDSOA remedies.

In *Gray*, Congress imposed retroactive "withdrawal liability" on employers who withdrew from a multi-employer pension plan beginning during the approximately five-month period before the statute was enacted into law. 467 U.S. at 725. Unlike the present case, the retroactive provisions in *Gray* were intended to address Congress's concern "that employers would have an even greater incentive to withdraw if they knew that legislation to impose more burdensome liability on withdrawing employers was being considered." *Id.* at 730–31. That is, the retroactivity was intended to induce employers to take the present action (or inaction) of remaining within the multi-employer pension plan, during the pendency of the legislation, in order to further the government's underlying interest in "ensur[ing] that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." *Id.* at 720.

In contrast to *Gray*, in which a present incentive rationally furthered a legitimate legislative purpose, the

retroactive portion of the CDSOA creates no present incentive to support government enforcement of the trade laws. Moreover, unlike the disadvantaged groups in *Commonwealth Edison*, *Turner Elkhorn*, and *Gray*, the group disadvantaged by the retroactive portion of the legislation in the present matter did not cause the harm remedied by the retroactive application of the legislation. In instances where CDSOA distributions are made, it is not clear there is any petition-related harm to remedy.

Given the context of the CDSOA, which diverges substantially from past cases in which government action has been upheld under rational basis scrutiny, this court must remain vigilant to the possibility that Congress's "responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals" or of favoritism toward preferred groups. *Landgraf*, 511 U.S. at 266; *see also E. Enters. v. Apfel*, 524 U.S. 498, 549 (1998) (Kennedy, J., concurring in the judgment and dissenting in part) ("Groups targeted by retroactive laws, were they to be denied all protection, would have a justified fear that a government once formed to protect expectations now can destroy them."); *United States v. Carlton*, 512 U.S. 26, 32 (1994) (upholding a retroactive law where "[t]here [was] no plausible contention that [Congress] acted with an improper motive").

According to the Government Accountability Office ("GAO"), "[f]ive companies, including [the] Timken [Company ("Timken"), MPB Corporation (a subsidiary of Timken), and the Torrington Company (acquired by Timken in 2003)], received nearly half of the total [CDSOA] payments, or about $486 million," while the remaining half was distributed among 765 beneficiaries. *See* GAO-05-

979, at 29 & n.39.[4]   Since the GAO report, over $100 million in additional CDSOA funds were received by Timken alone.  *See* The Timken Co., Annual Report at 88 (Form 10-K) (Dec. 31, 2014) ($112.8 million in CDSOA distributions received for years 2006 through 2010).  It is a simple matter to determine which companies "checked the box" in support of a past petition, and this case therefore presents a situation where a retroactive statute "'may be passed with an exact knowledge of who will benefit from it.'"  *Landgraf*, 511 U.S. at 267 n.20 (quoting Charles B. Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation*, 73 Harv. L. Rev. 692, 693 (1960)).

Because the *SKF* court incorrectly applied the rational basis test to the facts before it, that case should be overruled en banc.

---

[4]   It may not be coincidental that the original House and Senate sponsors of the CDSOA were Rep. Ralph Regula and Sen. Mike DeWine, both of Ohio, where Timken has been incorporated since 1904.  *See* Statements on Introduced Bills and Joint Resolutions, 145 Cong. Rec. S497-01 (Jan. 19, 1999) (statement of Sen. Mike DeWine); The Timken Co., Annual Report (Form 10-K) (Dec. 31, 1999).  Rep. Nancy Johnson of Torrington, CT was a co-sponsor of the House bill. 146 Cong. Rec. H9708 (Oct. 11, 2000) (statement of Rep. Nancy Johnson).